**STATE of Missouri, Respondent,**

v.

**Jerry GILPIN, Appellant.**

**No. WD 44959.**

Missouri Court of Appeals,
Western District.

July 7, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Sept. 1, 1992.

Lawrence R. McClure, Marshall, for appellant.

William L. Webster, Atty. Gen., Joseph P. Murray, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P.J., and KENNEDY and SMART, JJ.

SHANGLER, Presiding Judge.

The defendant Jerry Gilpin was found guilty by a jury of possession of a controlled substance and sentenced to seven years imprisonment and assessed a fine of $5,000. § 195.202, RSMo Cum.Supp.1990. The defendant contends that the conviction rests on illegal evidence admitted over objection and seeks a new trial. The sufficiency of the evidence for conviction, if validly before the jury, is not disputed.

On June 22, 1990, Patrolman George Workman of the Marshall Police Department was dispatched to the roadway area of Lakeview Trailer Court, and arrived there at about 1:15 a.m. There he discovered two men covered with blood and injured. The defendant Gilpin was bleeding from the face, lying in a pool of blood and moaning. Workman called for an ambulance after he determined that Gilpin was alive, but received no response to his questions. A small BB gun lay on the road some eight feet away. The other man, Michael Todd Sloan, came towards the officer and complained hysterically that he had been shot by a BB gun. Sloan raised his shirt to show Workman a small blister-like area on his chest. About then, Cpl. Johnson arrived on the scene and Sloan went with him to the police station.

The ambulance arrived with Hinnard and Blodgett, both attendants with the Saline County Ambulance District No. Three. Of-

ficer Workman held a flashlight while the ambulance attendants administered aid to Gilpin. Hinnard, a staff emergency medical technician, slit Gilpin's trousers and removed them to examine for any injury to his lower extremities. Ambulance attendant Blodgett removed some currency from a pocket and tried to hand it to Officer Workman, but he refused it. The officer explained that the money was to be kept with the person, "for the simple fact that this was dealing with [him] so far as [his] medical emergency." In the process of slitting the trousers, also, a bottle marked for vitamins was removed from Gilpin's pocket. Hinnard, the other ambulance attendant, opened the bottle "to determine if there was anything in there that we needed to be aware of that may alter the treatment that we performed on the patient." It is the usual practice of ambulance attendants to search the pockets of a prostrate patient for medications or anything else that might affect the treatment to be administered. Hinnard opened the vitamin bottle and saw little packages, folded up, and loose white powder in the bottom of the bottle. The attendant capped the bottle and handed it to Officer Workman with the comment, "Here's something you might want." The officer opened the bottle, looked inside, and saw four small packets and a white powdery substance around the edges of the container and along its bottom. He took the bottle to the police station, packaged it, and placed it in the evidence locker.

The ambulance removed defendant Gilpin from the scene. His trousers were left behind at the scene by emergency medical technician Hinnard because they seemed to be relevant to the apparent crime. Detective Juanita Walker arrived to secure the evidence and to process the crime area. She seized the defendant's trousers and returned them to the police station. There she followed standard department procedure and searched the trousers for anything of value. This is done to keep items secure until the owner can retrieve them. In the process, she discovered a small folded packet in the watch pocket of the trousers. It contained a white powdery substance.

The powdery substance in the four packets inside the vitamin bottle recovered from Gilpin's trousers was determined to be cocaine. The total weight of the substance found in Gilpin's possession was 2.83 grams. In defense, Gilpin testified that he did not know that the packets of cocaine were in his pockets. In rebuttal for the prosecution, Sloan testified that he did not plant the cocaine in Gilpin's pockets during the altercation with him.

The defendant Gilpin moved the court to suppress as the product of unlawful search and seizure the items taken from his person as well as the testimony of the police officers and the public ambulance district employees. The motion asserted that the vitamin bottle taken and inspected by the ambulance attendants without a warrant, or his consent, or probable cause, or incident to lawful arrest, or exigent cause, was an unreasonable search and seizure. The motion asserted also that the later search of Gilpin's trousers and seizure of the packet were unreasonable for the same reasons. The trial court denied the motion and received the evidence. On this proof, the jury convicted Gilpin of possession of cocaine, a class C felony.

## I. The Search and Seizure of the Vitamin Bottle

### A. The Ambulance Attendants

Gilpin argues that the first episode, the "removal" of the vitamin bottle from his trousers and then the inspection of its contents without a warrant was *per se* unreasonable. The admission of that evidence and the tainted testimony it yielded, therefore, was error and requires a new trial.

The principals acknowledge that the warrant requirement applies only to governmental actors. The protections of the Fourth Amendment are without application to a search or seizure, even an unreasonable one, conducted by a private person not then acting as an agent of government. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85

(1984). Gilpin argues from the premise that the ambulance attendants were state actors at the time the vitamin bottle was removed from his trousers and then inspected to discover the contraband content. He cites the testimony of Officer Workman that the ambulance responded to his call after he had come upon Gilpin alive, but only semiconscious, and in need of assistance. Therefore, the medical attention given to Gilpin [the argument goes], was "at the direction and control of Officer Workman," and the search by the attendants, even if "private individuals," was done at the urging or initiation of government and so was not a private search by employees of the ambulance district, but an action of the Marshall Police Department. Gilpin concludes, accordingly, that the full constitutional strictures against unreasonable searches and seizures govern the conduct of the ambulance attendants.

The prosecution argues, rather, that Officer Workman neither directed nor supervised the actions of attendants Hinnard and Blodgett, either in the performance of their medical duties or in their capture and inspection of the vitamin bottle. Thus, they were not agents of government for purposes of the Fourth Amendment, and the constitutional search and seizure analysis does not apply. The prosecution comes to this premise by the testimony of attendants Hinnard and Blodgett themselves, and by reference to § 190.005 *et seq.*, RSMo Supp. 1991. Those statutes enact "The Ambulance District Law" and enable voters in territories within the state to organize an ambulance district. An organized ambulance district becomes a body corporate and political subdivision of the state with the power to collect taxes and exercise governmental powers. §§ 190.005, 190.010, 190.-060. Among them is the power to employ persons for professional services necessary or desirable for the accomplishment of the objects of the district. § 190.060.1(6).

■ Whether a private person shall be deemed an agent of government for purposes of the Fourth Amendment must depend upon the degree of participation by that sovereign authority in the activity of the private person. That is an inquiry that can be resolved only in the light of the circumstances. *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989). The sweep of that principle does not depend upon whether the governmental activity is civil or criminal. It has been applied to railroad employees, school officials, building inspectors, OSHA inspectors and firemen, among others.[1] It applies to protect the interests of an individual in privacy and security against arbitrary invasions by governmental officials, whatever the occasion. *New Jersey v. T.L.O.,* 469 U.S. at 335, 105 S.Ct. at 739. It applied to protect Gilpin from any unreasonable incursion into his possessory interest in the vitamin bottle and privacy interest in its contents by the ambulance attendants, then acting out the governmental purpose of an ambulance district under §§ 190.005 to 190.085 to render emergency medical services.

■ The question the evidence presents, therefore, is whether the caption of the vitamin bottle by the ambulance attendants and their inspection of its contents without a warrant compromised his right to be free of unreasonable search and seizure under the Fourth Amendment. It is the guiding principle that, subject only to a few specifically established and carefully defined exceptions, searches conducted outside the judicial process without prior judicial approval, are *per se* unreasonable under the Fourth Amendment. *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978). It is the purpose of the Fourth Amendment to protect two types of expectations from unwarranted governmental intrusion. One involves searches and the other seizures. "A 'search' occurs when an expectation of privacy that society

---

**1.** *See seriatim, Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978).

is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen,* 466 U.S. at 113, 104 S.Ct. at 1656.

The unvarying command of the Fourth Amendment is that searches and seizures be reasonable, but what is reasonable depends upon the context within which a search takes place. "The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.'" *New Jersey v. T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 740 quoting *Camara v. Municipal Court,* 387 U.S. at 536, 87 S.Ct. at 1734. In this case, the legitimate interest of the individual Gilpin's expectations of personal security and privacy are weighted against the need of government for effective administration of emergency medical care to a person in that exigency. It is already an established principle that the warrant requirement is unsuited to the swift and informal responses needed in cases of medical emergency. *See Mincey v. Arizona,* 437 U.S. at 392–93, 98 S.Ct. at 2413. "A search of one found in an unconscious condition is both legally permissible and highly necessary. There is a positive need to see if the person is carrying some indication of a medical history, the rapid discovery of which may save his life; there is also a need to identify persons so found in order to notify relatives or friends." *State v. Miller,* 486 S.W.2d 435, 437 (Mo.1972); *State v. Wiley,* 522 S.W.2d 281, 293–95 (Mo. banc 1975). A medical emergency, therefore, is a variant of the exigent circumstances doctrine and will support a search by the governmental actor of the stricken person's pocket, purse or wallet without a warrant. *State v. Miller,* 486 S.W.2d at 437; *People v. Wright,* 804 P.2d 866 (Colo.1991); *Wagner v. Hedrick,* 181 W.Va. 482, 383 S.E.2d 286 (W.Va.1989). A person found unconscious or semi-conscious and so in need of emergency medical treatment, therefore, has no reasonable expectation of privacy in the contents of his trousers once that treatment is administered.

The mere claim of exigency, however, does not suffice. The scope of any exception to the warrant requirement is limited by a real exigency the immediate need to assist in the protection of human life. The warrantless entry or intrusion may not be the pretext for search or arrest, and the search that follows must maintain a reasonable connection between the emergency and the area implicated. *See generally Mincey v. Arizona,* 437 U.S. at 393, 98 S.Ct. at 2413; *State v. Rogers,* 573 S.W.2d 710, 713 (Mo.App.1978); *Wagner v. Hedrick,* 383 S.E.2d at 293. The burden is on the prosecution to show that under the circumstances of the case such an exigent intrusion was necessary. *Mincey v. Arizona,* 437 U.S. at 390, 98 S.Ct. at 2412.

The ambulance attendant, staff emergency technician Hinnard, acted reasonably and in good faith in the administration of emergency treatment to Gilpin, found on the street in a pool of blood, injured, only semi-conscious and unresponsive. He also acted reasonably and in good faith when he and the other attendant cut and removed the victim's trousers to look for injuries to his legs, and in the process looked inside the pockets "to determine if he was taking any medication, anything that we needed to know about him that he could not answer for us." The seizure of the vitamin bottle found in the pocket and the search of its contents was also prompted by obvious medical concerns, and was reasonable. The attendants, contrary to argument, did not act "under the supervision, direction, and control of the Marshall Police Department," so as to constitute their actions those of the police. Accordingly, the lawfulness of their warrantless actions was not governed by the "probable cause to believe that a violation of the law has occurred" standard that appertains to law enforcement officers, but by a reasonableness standard short of probable cause. *New Jersey v. T.L.O.,* 469 U.S. at 340, 105 S.Ct. at 742.

The point is denied.

## B. The Search and Seizure of the Bottle by the Police

■ Gilpin complains nevertheless that the initial warrantless search of his pockets and the contents of the vitamin bottle found there by the ambulance attendants in the exigency of emergency notwithstanding, the subsequent search of the bottle by Officer Workman without probable cause or warrant was illegal. It was indeed the testimony of the officer that at the time ambulance attendant Hinnard handed him the vitamin bottle with the comment, "Here's something you might want," he had concluded that a crime was committed, but made no arrest because he had no idea as to "who was the suspect, or who was the victim, or what." The first thing that Officer Workman did when the bottle was handed to him was to take the lid off. He knew that it came from Gilpin because the police investigative crew "was taking things from him so they could be sure that they didn't leave anything behind." The basis he had to believe that the contents of the bottle "might offend against the law" prior to opening the lid was the way the attendant suggested that he might be interested in it.

It is evident that by the time the vitamin container was handed by the ambulance attendant to the police officer, the emergency exigency that justified the warrantless search of the vitamin container for information useful to treatment of the victim was spent. It had already been examined for that purpose by the trained attendants. The bottle was given to the officer, not for his aid in the emergency, but because the attendants believed that the contents were narcotics, and it was received on that premise. The attendants, then governmental actors in an emergency, came into the possession of the bottle as well as of its contents lawfully and legitimately. No warrant was necessary, as there was a search and seizure made valid by exigency. *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978); *State v. Miller*, 486 S.W.2d at 437.

The question remains whether Officer Workman came into lawful possession of the vitamin bottle and lawful view of its contents. In reality as well as in principle, the attendants and the police officers were all governmental actors, although in different roles. To some extent their disparate functions inevitably mingled during the emergency. The police officers came not only to a crime scene, but also to a medical emergency, and undertook to act as to both. The ambulance attendants were called in by the police to give emergency assistance to the victim and as an incident of that care came upon the illegal drugs in the vitamin container. There is no doubt that these functions were performed legitimately throughout. The vitamin bottle was taken and examined by the attendants for information that would aid them to save Gilpin's life. Thus, the container was opened by the attendants under lawful authority. It was then almost instantaneously, and intact, transferred to Officer Workman. Thus, the dominion and control over the substance in the bottle by the successive governmental actors never lapsed even momentarily from its lawful discovery by the ambulance attendants until possession lodged in the police.

In every true sense, therefore, the possession and inspection of the contents of the vitamin bottle by Officer Workman was not a separate seizure and search. It was, rather, a continued exercise under the lawful authority of the prior valid seizure and search by the ambulance attendant governmental actors. It is a conclusion that reasonably accommodates the values protected by the Fourth Amendment and the interests of effective law enforcement. It protects reasonable expectations of the security of property against arbitrary seizure and the expectations of privacy against arbitrary search. *United States v. Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656. It also gives effect to the principle that, where a police officer merely reexamines what has already been viewed under lawful authority, then the officer does not infringe any privacy expectation not already compromised by the prior lawful search. *Id.* at 117, 104 S.Ct. at 1658.

Where the prior lawful search and seizure is of a container with illicit contents,

however, the continued validity of the successive possession by the police officer depends upon the quality of the probability that the contents are unchanged. It is because the contents of the container could not have changed since the prior, lawful, viewing that obviates the need for the warrant requirement before the police may open the container already properly in their possession. *See* 2 LaFave, Search & Seizure: A Treatise on the Fourth Amendment, § 5.5(e) (2d ed. 1987). "[A]bsent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a container previously opened under lawful authority." *Illinois v. Andreas*, 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1982). Here, the probability that the contents were changed is nil.

The point is denied.

## II. The Search and Seizure of Gilpin's Trousers

■ Gilpin complains next that warrantless seizure and search of his trousers and of the contents of the watch pocket was illegal so that the packet of cocaine that it yielded should have been suppressed. He repeats that since the search and seizure of the clothing and its contents was neither incident to a lawful arrest nor "pursuant to any lawful purpose," there was no ground to search and seize without a warrant.

The ambulance attendants cut away Gilpin's jeans and t-shirt in order to administer first aid. The trousers remained on the street where they had been left by the paramedics when Gilpin was transported to the hospital. Detective Juanita Walker arrived thereafter. It was her function to secure the physical evidence that remained on the scene of the apparent assault, photograph it and gather it up. In the course of that duty she seized the trousers, then covered with blood, and returned them to the police station. Conformably with standard departmental procedure, the officer searched the trousers in order to secure anything of value for eventual return to the owner Gilpin. She found a small folded packet in the watch pocket of the trousers.

The package contained a white powder substance, determined to be cocaine. It was used in evidence to convict Gilpin.

The time and place when Detective Walker saw the trousers and gathered them up in the course of regular duty, involved no physical intrusion into a constitutionally protected area. It was on a public street where anybody had a right to be, and in plain view. "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990). The essential predicate of a warrantless seizure, that the officer was lawfully in the place where the evidence was plainly viewed, adds two concomitants: not only must the item be in plain view, but its incriminating character must be immediately apparent. 496 U.S. 128, 110 S.Ct. at 2308; *Arizona v. Hicks*, 480 U.S. 321, 326–27, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987). Here the officers came upon an assault scene. Although at the time Detective Walker gathered up the trousers and other evidence, and then searched the pockets for safekeeping, the defendant Gilpin was not yet a suspect, nevertheless there was reasonable cause to believe that a crime had been committed, and that the blood-soaked trousers was evidence of that crime. Its incriminating character was immediately apparent.

■ The inventory search of the pockets was conformable to standard departmental procedures, and not as a pretext to search for evidence. An inventory search conducted in good faith is an exception to the warrant requirement. *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990). It serves to safeguard the property of the victim and protect the police from future claims. *Colorado v. Bertine*, 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). The evidence the inventory search yielded was lawful evidence.

The point is denied.

III. Closing Argument

■ Gilpin argues, as the final point, that the argument to the jury by the prosecutor that he had been convicted three times of assault, "when there was no evidence of three assault convictions of the appellant," was error and prejudicial. Taken on its own terms, the point is without merit.

Gilpin took the stand in his defense. In response to direct examination he acknowledged two prior assault convictions. He also acknowledged two prior driving while intoxicated convictions. On cross-examination of the prosecutor, Gilpin admitted to "three prior alcohol convictions." He was then asked, "You have a history of assault, don't you." He responded, "Not with a weapon." The prosecutor continued: "You have three convictions for assault, don't you." Gilpin responded: "Yes, I suppose. I don't know. 20 years ago, yeah. I'm sorry." There was evidence of three assault convictions, rather than the two that Gilpin admitted on direct examination. Therefore, the closing argument of the prosecutor was within the bounds of the evidence. This evidence was not then refuted. Moreover, the evidence came in without objection, so that the claim of error cannot now be heard for the first time. Defense counsel did object at the outset of the cross-examination inquiry as to the convictions, but only that the prosecutor not be allowed to "getting into the nature and circumstances of the convictions." The inquiry of the prosecutor was as to the number, and not the circumstances, of the convictions.

The point is denied.

The conviction is affirmed.

All concur.

